All rise. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Please be seated. Good afternoon. Good afternoon. We're here for Broward Bulldog, Inc. v. Department of Justice. We're going to proceed today with an unclassified portion of the oral argument, and then when we reach a point where the members of the court have some questions for the government that involve classified material, we are going to clear the courtroom and we won't have any further proceedings following that. Okay? I just want everyone to know that's how it's going to proceed. Mr. Julen? Thank you, Your Honor. May it please the court, I'm Thomas R. Julen of Gunster, Yolkley & Stewart. For the appellants, the Broward Bulldog, Inc., and Dan Christensen. I have with me today Ray Miller, Kyle Teel, and Annihilee Cure, who are all on the brief with me. We also are very fortunate to have some of our summer associates with us who have been very helpful in this matter, Symero White, Sam Greco, Caitlin Allen, and Steve Cunningham. I want to thank them for coming. We also have with us today Senator Robert Graham, who has filed an amicus brief in the case, sitting in the front row there with Dan Christensen. Of course, the New York Times, the Associated Press, the Washington Post, and the Wall Street Journal, and other media have also filed amicus briefs, and there is a representative of the Associated Press here today. Before I begin, I just want to state an objection to the closure of any aspect of the hearing. There's been no notice to us. There's been no notice to the government, as far as I understand. There's been no notice to the public or to the press. So on First Amendment grounds, I'd like to object to any closed proceedings in this courtroom. None of the briefs, of course, have been filed under seal. All the arguments have been out in the open. I don't see any basis. And under the Richmond newspapers versus Virginia case, as well as the Globe newspaper versus Superior Court case, and other cases from the United States Supreme Court dealing with openness of court proceedings, there is not proper notice and there's not a proper factual predicate for closing any aspect of this hearing. Well, Mr. Jewel, in this scenario, it seems that there are a couple of ways to proceed. One is that the courtroom, as the First Amendment and our system of government presumes, is open to everybody and everything is set out in the open and we're done. But in that sort of a proceeding, we may not be able to ask the government any searching questions about content which is classified. So if you have your way and there aren't proceedings after the open part of the argument, some of the questions which you might raise in your brief about some of the issues, some of the matter that's been redacted, classified, et cetera, those questions may never be asked. So what do we do? I appreciate that and I am concerned that the court needs a full opportunity to assess the appeal. But I believe that this appeal should be resolved on the record without any sort of closed proceedings. As I indicated, there's been no notice and there's no factual predicate for closure. I don't know of any precedent which would allow for a closed appellate argument such as this one. So I understand what you're telling me, I think. How is that any different than the review of classified material in an ex parte setting in a district courtroom? It is distinct, I think, and unusual for a court of appeals to have its own hearing on the appeal conducted in ex parte essentially so that you can hear specific arguments from the government that we can't respond to. I think that there's certainly a due process problem that that creates as well as a First Amendment problem because we can't respond. You're right. That problem exists at the district court level as well. And so there are equal problems. But that's my objection for the record. I'd like to otherwise proceed with my argument. I'm not trying to take up your time. I will let you make your argument. I feel very uneasy in this process, too. I don't do it very often. But I understand my role is to or that what you have asked us to do is to review, for example, whether or not the government has specifically asserted exemptions under the Freedom of Information Act and then also with regard to the classified documents. And, you know, what I thought I wanted to really spend most of my time doing today is point with the government to specific parts of documents that you have not been privy to and asking how exactly does that fit under this exemption to the Freedom of Information Act or how exactly does this qualify to be classified. And I don't know how to do that if you're here. Well, and I very much appreciate that the questions that you may have may be very helpful to the arguments that we're making. But I think that the solution, if you cannot tell from the record whether the exemptions have been properly asserted, is to reverse the summary judgment that was granted for the government in this case. The record either sustains what the government did here or it does not. And our position is that it does not and that reversal is required for further proceedings in the district court and it's then up to the district judge to manage that problem and dealing with, I think, just precisely some of the issues that you're raising here about how to conduct the hearing. It seems to me, Mr. Doolin, you and I may be on the same wavelength about this because as I understand your appeal, you've raised questions about whether the district court committed errors of law. That is correct. That are for our review, right? That is correct. And you think the district court made errors of law without having to be privy to those documents. Isn't that right? That certainly is true. And we need to evaluate those arguments. That is correct. And we can do that in open court. That is my position indeed. Okay. Well, let's go. So we've raised really three arguments for reversal of the summary judgment. One has to do with respect to the adequacy and the reasonableness of the search. The second argument has to do with specific redactions or withholding of five particular documents. And the third issue that we've raised is whether the trial judge should have allowed us to take one deposition of an FBI special agent by the name of Jacqueline McGuire. The first issue I would submit is really the most important one that we have to deal with here. And before I address that specifically, I want to make sure that the court understands the factual circumstances under which this particular appeal arises. Because they are very unusual facts. And it arises really from a conscious decision. We understand that. We've read your briefs. We've read the district court's orders. We understand that. All right. Thank you, Your Honor. So let me then just go directly to the issue about the reasonableness of the search and whether there should have been a summary judgment granted to the government on that point. So the standard that the government has to meet in order to show that it's conducted a reasonable and adequate search is it's got to show beyond a material doubt that it has conducted a search reasonably calculated to uncover all relevant evidence. That's a tough standard I would submit. It's beyond a material doubt. The factual circumstances that I was about to discuss and that I know that you are very familiar with, many of those factual circumstances bear directly on that question as to whether there's a material doubt about what the FBI did here in searching for responsive records of what I'll refer to as the Mies Commission was reasonably calculated to find all of the relevant documents. The two cases that I would direct your attention to that are most directly relevant, of course, are the Miccosukee Tribe of Indians versus United States case and the much more recent decision from the District of Columbia Circuit Reporters Committee for Freedom of the Press versus the FBI, which was decided just in December of 2017. That case had some of the same problems that we are facing in this case. In that case, the media was seeking records of the FBI involving impersonation of the media. It was the whole fake news problem that was being pursued by the media in that case, only it was really fake representation of the media by the FBI. The FBI's records custodian, David Hardy, filed two declarations in that case and a summary judgment was granted for the FBI on the strength of those two declarations. Reversal was required by that District of Columbia panel because the declaration that was filed by Mr. Hardy did not have search terms, did not describe the type of search that was performed, how divisions that he had assigned. I don't know why that would have been necessary here when what has been described is a document-by-document search. Your Honor, we didn't think that anything more than what was done was required either initially. Because when the first declarations were filed by Mr. Hardy in this case, he said, why should we have to conduct a search of our electronic records, the Sentinel system, the central record system? This was a specific project that was assigned to the Director's Office. Congress created this panel. We went to the Director's Office. We asked the Director for whatever files existed there. He said that there is an electronic database. He produced to us the database. We did a document-by-document, as you're saying, search. We thought, fine, that seems like a reasonable way to proceed. And that's what Mr. Hardy said in his declaration. But what came back from that search was that many of the records that were specifically referenced in the Mies Commission's report were not produced to us. We went back to the FBI. We said, where are those records? We're looking for all the interviews that are listed, the reports that were given. We don't see many of those records. Mr. Hardy then went back to the FBI Director's Office, to people who are not identified, and said, look, the plaintiff is complaining. You're not giving us the records. So what apparently happened in this case. As I understand it, what happened is after you were told that they had done a document-by-document search, there was correspondence. And then they went back and looked, and they found a file that they hadn't seen before, went through all those documents, and everything in it had already been produced. And then they found some additional documents, went through a document-by-document search, and produced some documents from that. What Mr. Hardy's declaration said, and I really would urge you to look closely at his fourth and fifth declarations, because he describes what happens, that the FBI Director's Office comes back and gives them some leads. He refers to them as leads. And then we went and we searched in places that we didn't think those documents would be located. We started to use the Sentinel system, which is their elaborate indexing system, and we found that there were some other documents that were out there. He doesn't tell us how that search was conducted. He doesn't tell us what the search terms were. We don't know that he found all the documents. He does also say, we found that documents had been set aside, sent to another location that the Director's Office did not tell us about, and that those documents had been set to be destroyed. We were very upset and disturbed that any of these News Commission documents had been set to be destroyed. He makes an argument that these were transitory documents. We don't think that we are. We cite the case law. We think that's relevant in the applicable statutes. You can't simply destroy records of this type of commission, and they then start to produce other records. So the question really is, is there any material doubt? There is, on this record, a material doubt about whether this search was reasonably calculated. And in the specific factual context of this, a News Commission report that is trying to specifically discredit a key document that, in prior Freedom of Information Act litigation, we had required the FBI to release, and which seemed to show that the FBI's public statements about this investigation that it had conducted in Sarasota about a Saudi family that disappeared, it seemed to suggest that the FBI was lying to the public and to my client here about what it had found. And perhaps more importantly, it substantiated what Senator Graham was telling us, that the FBI had conducted this investigation and had not disclosed it to Congress. What we're looking to do is to find out what the government is up to, a major purpose of the Freedom of Information Act, and we feel as though we've not even been told whether we've gotten the full universe of documents that are responsive to the request. That is our first argument for reversal. Our second argument for reversal, it deals specifically with the five documents. And Document 22, it's referred to in the briefs, is a document that is a fairly stunning document. You may have seen it on the first page of our brief called Funding of the 9-11 Attacks. And this was presented to the News Commission as an overview document. It is redacted solely on B7E grounds. This is techniques and procedures, supposedly, that would be revealed. Judge Altanaga, when she reviewed this, she initially ruled in our favor. She came to the conclusion that, well, whatever the facts and information that you're providing about the funding of the 9-11 attacks, that is not a technique or procedure of the FBI. It simply doesn't fall within the statutory language there. She reversed herself because, after ruling for us, Mr. Hardy came back in and said, well, facts and information sometimes can reveal the techniques and procedures of the FBI. I don't understand that. I don't see that. Of course, I don't know what has been redacted there. But this does not seem to fall at all within the 7E exemption. There is an issue here about a split between the circuits and how the 7E exemption applies. But this argument is not really dependent upon that split between the circuits. If this is not information that shows a technique and procedure, that should be revealed. And there are other similar documents, early to mid-2001, additional funding. Those documents also are redacted solely on 7E grounds. Again, the district judge originally ruled for us. She turned herself around and she ruled against us on the strength of the new declaration that Mr. Hardy filed, really his seventh declaration in the case. That's document 22. The other document, document number one, is the Sarasota case file. Again, this is a specific document that's referenced in the Mies Commission report. The Mies Commission came and said, we reviewed the Sarasota case file. We said, please produce the case file that the Mies Commission did review. They came back and said, well, there's prior litigation that involves the same documents. We don't know whether it's the same documents or not. That's the problem. There's no exemption that says if there's some other litigation that's pending. And that litigation has now been pending for more than six years. We don't know what's happening in that. We have urged the district judge to rule as soon as possible. But we did not get the documents there. We did not have the documents here. The time, I think, has come to produce those documents that consist of the Sarasota case file that was specifically reviewed by the Mies Commission. Document two. If we were to address document number one, we would be doing so without any district court ever having given us a ruling to review. Isn't that right? Yes. And that's why I think that you should reverse the summary judgment that allows the FBI to withhold those documents. It should require the FBI to submit those documents that consist of the Sarasota case file that was reviewed by the Mies Commission. They can claim whatever redactions they want to claim. But those documents were never even produced to the district court. So that is another basis for reversal. Document two is a document that is specifically ‑‑ let me just turn to that. This is the April 10, 2014 briefing. And I won't go through all the redactions to this document. There's just a little too much detail on this to go through it all. But this document, particularly at the end of it, the last paragraph of this document, which is briefing the Mies Commission on everything that the Broward Bulldog reported. It's analyzing that and it's analyzing this memo that was written by an FBI agent that said, yes, I found many connections between this Saudi family and the 9-11 hijackers. That is a particularly important document because it really purports to undermine that many connections memo that seems to confirm the reporting that was done by the Bulldog, seems to confirm what Senator Graham was telling us. And at the end of that memo, there is a redaction that's called gaps slash possible issues slash recommendations. And that redaction is made in reliance solely on exemption five. And that is an exemption that applies for interagency and intraagency memos. That's when the FBI is sending to another branch of the ‑‑ another agency within the executive branch a memo that says, here's what we're working on. It's for that deliberative process privilege. This is not what's happening here. This is a congressionally created committee that was appointed, yes, by the director of the FBI. Three people were appointed. But that is advising Congress. It is not advising other parts of the executive branch. The three cases that we've cited there are very clear. The Rockwell case, Dow Jones, Hennessey versus Agency for International Development. This is from the D.C. Circuit and the Fourth Circuit. All three of those decisions say in that context there is no exemption five grounds. So that should be reversed with respect to document two. Document three and document five, those are documents where exemptions one and three are asserted. This is the classification. This is the National Security Act of 1947 requires the withholding of the documents. Obviously we don't know what is in those materials. And obviously we're deeply concerned what is in those materials because of an overriding concern that what all these exemptions are being asserted by the FBI in order to conceal something that is either misfeasance or malfeasance. But the way that the district court dealt with the exemption one and exemption three grounds, she said specifically because of the possible strong implications of national security, courts should defer to an agency's decision. That is not what the court is supposed to do. The court is supposed to make a de novo determination that's expressly set out in the statute of whether these documents have been properly classified or are properly required to be held by a statute. I have a question about what arguments you're making. And I really have worked hard at this, but there's just a lot of moving parts and I'm trying to be sure I understand it all. So I read Senator Graham's amicus brief. I found it very helpful, interesting. But I understood Senator Graham to be making arguments about over classification of documents that you did not make. Am I mistaken about that? I think that they bear on this issue. We're making the argument from the perspective of whether the district court acted properly and did a proper de novo review. Obviously, Senator Graham is saying over classification is a serious problem. And we think if the district court did a proper de novo review and looked really at how these documents were classified, what the documents were about, whether these do imperil national security as is required by the National Security Act, then a different result would have been reached because we agree with Senator Graham that the withholding of these imperils national security doesn't protect national security. I'm going to give him four more minutes because we cut into your time to begin with. Thank you. And I appreciate it because Mr. McGinn would like to make the arguments that are addressing the government's cross appeal in the five minutes I have remaining. So if we – I mean, some of the FOIA objections that you're raising are in the classified portions of the document, right? I mean, I don't know how you know what's in the classified. Yes, obviously we don't know what's in those documents. They have been redacted. We haven't seen them. But I understood that some of your general FOIA objections were directed towards the classified portions of the documents. I might very well be wrong about that. No, that's correct. We are objecting that the district court did not conduct a proper review of the redactions on the basis of classification of the documents. And your view is that the district court didn't apply the right standards? Correct. That's correct, Your Honor. Can we talk about the exemptions 7C? Yes, we can. And I'd like to yield to Mr. McGinn, who is prepared to address the government's arguments on its cross appeal. Okay. Thank you. Unless Jill has something else she wants to add. I don't think he understood that you were giving him four more minutes on his 20 minutes. Yeah, I was giving you – well, I want to get to the 7C stuff before we hear from the government. Even though I know it's the cross appeal, but I would just assume – I don't want to keep bouncing back and forth. If this is the attorney who's going to address that. And the one other point I should have raised is there's an issue about the deposition of Jackie McGuire. I just want to make sure that we have raised that. Anything you've raised in your brief is raised in your brief, whether it's addressed at argument or not. But I don't think that this has to be addressed in rebuttal. And you can still have your rebuttal time. Where were we, though, with the four minutes, Brenda? You erased that and had two minutes left. All right. Well, we'll start with five minutes. That'll be fine. Good afternoon and may it please the Court. Timothy J. McGinn of Gunster on behalf of the Bulldog and Mr. Christensen. It looks to me like the district court made some errors when it comes to the exemption 7C. So it seemed like the primary argument has been that the Bureau has acted inconsistently in redacting some names but not others. To me, the inconsistency suggests that the government may have been able to redact more information than it did. At least that's possible. But is it your position that the government undervalues the privacy interests of one individual and must release the privacy information of all the individuals? Our argument is that in this context, the decision to redact some individuals' names and not others is evidence that the privacy interests assigned by the government do not apply. Why is that? Well, for example, Your Honor, the government has chosen not to redact the name of Jacqueline McGuire as one of the briefers of the Mies Commission. The government simultaneously asserts that... I don't know why that tells us anything about the privacy interests of those who it did redact. The argument asserted by the government is that briefers of the Mies Commission would be subject to harassment and possibly retaliation if their identities were to become known. The fact that Ms. McGuire's name has not been redacted indicates that those privacy concerns do not apply to all briefers of the Mies Commission, do not apply to all individuals who provided the Mies Commission with information. Might it be, though, that they just undervalued her privacy interests? And does it mean, though, that they shouldn't be protecting the privacy interests of those who were redacted? No, I don't think so, Your Honor. Why? Why not? Why was the government not undervaluing Ms. McGuire's? But there's no basis in the record for distinguishing Ms. McGuire from any of the other individuals whose names were redacted. So we don't have a basis upon which to conclude why the government redacted some individuals and not others. Perhaps they are, as the Court is saying, undervaluing Ms. McGuire's privacy interests. It also seemed to me the district court suggested that guilty individuals don't have the same privacy rights as the innocent. But then it said it thought that if there was exculpatory information about individuals, that they would want that to be known. So it seemed like whether they were guilty or innocent, the information still comes out either way. That didn't seem right to me. I think we can take a step back and look at both the privacy interests that have been asserted by the government and also the public's interest. Because I think the public's interests in the information are broader than simply understanding whether a person had ties to criminal activity or not. This is not a situation like Reporters Committee before the Supreme Court where the request was for rap sheets and merely to learn about criminal information of private individuals. The reason that the Bulldog made these requests was to understand how the Mies Commission reached the conclusions that it did and how the FBI chose to disseminate information to the Mies Commission, what information the FBI chose to share and what information the FBI chose not to share. This is what we said in Nadler. Exemption 7C takes particular note of the strong interest of individuals, whether they be suspects, witnesses, or investigators, and not being associated unwarrantedly with alleged criminal activity because of the potential for harassment, intrusion, or stigmatization. It would seem to me that these individuals would have strong privacy concerns that they not be associated with one of the most heinous criminal acts in our history. I think the analysis turns on who the individual is and what the circumstances are. The key term there is unwarrantedly. If there is an individual who has been convicted of a crime and that conviction is public, perhaps the dissemination of that information is not unwarranted. There's also the situation concerning the Al-Hijji family where the information has already been made public, so the further disclosure of that information would not be an unwarranted invasion of their privacy. Wouldn't the investigators have a strong interest or a legitimate interest in not being identified by other terrorists? The investigators at the FBI? The Hardy Declaration says that he assumes the possibility that there would be retaliation. There's no evidence in the record that these individuals would be subject to retaliation, particularly here when it's not just line agents, but there are also higher-level FBI officials who are briefing the Mies Commission. There's no suggestion that someone, by providing information to a committee that they themselves personally did not collect, would be subject to retaliation by a terrorist. It seems to me what the act's about, though, is the public being able to understand how the government is conducting its business. What's unclear to me is how learning the specific names of investigators, witnesses, and suspects is likely to advance the public interest in learning what our government's up to. Well, with respect to the briefers, it's important to understand what it was that the Mies Commission was basing its conclusions on. Was it being spoon-fed the FBI's preferred version of events? What was the name to do that? Well, you can find out who it was that the Mies Commission was interviewing. Were they interviewing the individual who prepared the Many Connections Memorandum that said that the al-Hijis had many connections to the 9-11 hijackers? Were they being briefed by more senior officials who had gathered the information second- or third-hand and did not themselves have personal knowledge of the events? It goes to the credibility of the information that was provided to the Mies Commission, but also the credence that should be given to the Mies Commission's findings by people who read the report. If the individuals who gathered the information are not the ones who are providing the information to the officials on the Mies Commission, then perhaps it should be entitled to less weight. That is ultimately what distinguishes this from the other 70 cases cited by the government. Thank you. Thank you, Mr. McGinn. Mr. Byron. Thank you, Your Honor. May it please the Court, I'm Thomas Byron from the Department of Justice. I'm happy to address any questions the Court might have about the plaintiff's appeal in this case, but I guess my overarching view that I think it's important to keep in mind is that all of the issues that they've raised, whether it comes down to the adequacy of the search or the applicability of particular exemptions to withheld or redacted information in particular documents, are subject to well-established case law from this Court to some extent, but I recognize this Court has decided not quite as many FOIA cases as some other circuits, and so we've pointed to consistent doctrine around the country that applies the well-settled principles in those areas, and we think that... One of the things that's not so settled is this public domain exception, right? So I don't think that that is an area of uncertainty or unsettled law, Judge Pryor. In fact, what the plaintiffs are arguing about public domain is not at all what the courts have recognized as public domain. So just to take an example, the plaintiffs make a great deal about their assertion that because the media has speculated about the identity of a family who lived in Sarasota, that that family's name is in the public domain. But that's not what the public domain case law says. The public domain case law is about the government's official acknowledgement of the same information, and only when the same information has previously been acknowledged by the government in a release of official information is it in the public domain in a meaningful and relevant way under FOIA. You mean that the government has to officially, formally admit something? Well, Judge, let me give you an example that's not this case, okay? A government document gets leaked to somebody in the media, and that document or a portion of that document gets published, okay? And the document says X, Y, and Z. Is that in the public domain? The government doesn't admit or deny the existence or truthfulness or accuracy of that document, just no comment. Right, and Judge Jordan, you're right to point out that that has happened in the past and that it has created difficulties because that is not an official acknowledgement. I know, so I'm asking you whether that's in the public domain or not. Not for purposes of FOIA in terms of a waiver of the government's protections of FOIA exemptions. If non-government people who learn of government information tell the press X, Y, and Z is true, is that in the public domain? Again, Your Honor— But there's no speculation. Now the media is reporting on what someone on the inside has said. So your hypothetical, Your Honor, is somebody inside the government leaking information— No, no, somebody inside the circle of knowledge but not a member of the government. Not a member of the government. Say, for example, someone who was working in some sort of consultancy role with the government on a matter, and that person decides that for better or for worse, for good or for bad, he or she is going to disclose some information to the media. And he says, you know, on this date, A, B, and C happened. And the media reports, hey, this person, they give the name, told us that on these days, A, B, and C happened. Is that in the public domain? Again, Your Honor, not in the FOIA sense, no. So there has to be a formal government acknowledgement. Yes, Your Honor, it has to be an official acknowledgement. For purposes of waiving the FOIA exemptions— What does a formal acknowledgement mean? So the government may have released the same information in a different document or even in the same document in a prior FOIA request. That happens— It has to be a FOIA request? No, Your Honor, of course not. It could be a release in other contexts. It could have been a release publicly to Congress in response to an inquiry. That's happened before, too. Those are all official acknowledgements. They reflect the government's recognition that this information is now in the public domain from the government, that it is attributed to the government. And that's the meaningful difference. Your argument, as I understand it, then, is that the public domain exception is a legitimate one, but it only has application where the government has basically waived any objection by disclosing it publicly. So I think that is exactly right, Judge Pryor. I think that's a good summary of— It's not an exception that our court has recognized, one way or another, right? Right, and that's what I pointed out earlier, that this court hasn't decided quite as many cases as some other circuits, and I think it's important to look to the way those courts have decided these questions uniformly and the rationales for doing so. And, again, the rationale behind this official acknowledgment requirement, Judge Jordan, goes back to the damage to the government and the different— put it in terms of privacy interests because that's one of the very important ways this comes up. The damage to the individual is different when the government says you have been, for example, the subject of an investigation or a witness in an inquiry or a law enforcement investigation. That's very different than having the media speculate that that was the case, even if the media is pretty sure that that was the case. The harm to the individual's privacy concerns is different, is meaningfully more significant in that circumstance. And so that's—it's just a demonstration of harm. The other example this comes up in a lot is in Exemption 1 and 3 with classified information. The government is not required to disclose classified information merely because somebody has speculated about the substance or the content of it. That's very clearly not the law under FOIA. Can I ask you a question on a matter that's not governed according to anybody's briefs or the district court's order by FOIA, and that's Document 1? Okay. The district court didn't rule based on any FOIA exemption or FOIA principle. What it said, if I have the documents in my mind right, was that document was sought in a separate proceeding, the government has represented that it's been produced in some way, shape, or form in that proceeding, and I'm not going to let the bulldog try to seek it here. That has nothing to do with any FOIA principle. That's sort of like a claim-splitting principle. We're not going to let you proceed in two different FOIA at the same time, right? Yes, Judge. Okay. My question to you is this. What assurance did the district court have, and do we have, that that document was in fact produced in the other litigation since nobody has seen it? Well, first of all, the judge in the other district court proceeding has seen it. Yes, but he was not the judge in this case. Of course. It would be a different story if the same judge was handling both cases and knew what had been produced in case one and then saw that the request was duplicative in case two. So how do we figure that issue out? So we know it from the record in this case because it's the subject of Mr. Hardy's declaration where he explained that there was this overlap in the two requests that the Broward Bulldog had made to the FBI, and that because the first request was pending before the other district judge and that request had already been produced in camera, the responsive documents and more. In fact, even documents that went beyond what was responsive had been produced for in-camera review in that case. It would be duplicative. How does that declaration get tested if the court doesn't have those documents? Well, it's like this actually is governed by FOIA law, and it is the principle that the declarations are subject to a presumption of good faith. No, no. I don't mean the declaration. I'm sorry. I didn't mean to cast doubt on the person who was submitting the declaration. But in a normal FOIA case, this one, for example, the government files a declaration, files a Vaughn index, asserts one, two, three exemptions for a given document or for a given redaction, right? And the district court has the ability, you know, under the correct procedures, to review that document to see whether or not those exemptions were properly asserted. That part of the process seems to be missing, maybe through nobody's fault, with regard to document number one. So how do we know that document number one was really produced in that case if the district court here has never seen it? So let me just separate the two parts of your question, if I may. The first part is how does this court know and how did the district judge in this case know that the document one had been produced to the district judge in the first Bowery Bulldog case? And the answer to that, I think, is the Hardy Declaration. That's how we know. And if the district court actually saw the document, it wouldn't tell the district court whether it was produced in that case or not, right? I think that is exactly right. The only thing that would tell it so is the Hardy Declaration. Isn't that right? Yes, I think you are right about that. And so to answer the first part of your question, Judge Shorten, I think that the declaration is the evidence in this record and it is sufficient for that purpose to demonstrate the overlap existed, the documents that were overlapping were submitted to the district judge for in-camera review in the other case, which remains pending. I think the second part of your question, if I'm understanding it correctly, is how does the district judge in this case know that the exemptions that may apply, the FOIA exemptions that may apply to the parts of that document that will ultimately be withheld were properly applied? And I think the answer to that is because the other district court proceeding will test that. Well, the district court here never reached that, right? Right, and there was no need to. I think this, you're right, this is not governed by FOIA law. This is principles of judicial efficiency, claim splitting, doctrinal concerns that go well beyond FOIA cases, right? And so the district court here certainly didn't abuse its discretion, we think, in deciding not to give the plaintiffs here two bites at the apple with respect to the same documents. Could the district court have forced you to do it if this was not governed by FOIA? So if it were not governed by FOIA... We agree that it's not. The basis of the district court's current ruling is not governed by FOIA, right? Right. Because it never ruled on any exemptions. Right, and so this is ultimately a discretionary question of judicial efficiency and judicial management. And so presumably there's a wide range of discretion available to a district court faced with these kinds of questions, and sure, the court had a lot of options available to it. The question is whether it abused that discretion here. I think it didn't, and it explained its rationale clearly as well. If court has any questions about the adequacy of the search, I'd be happy to address it. I just want to make one quick point about that, which is that the case law very recently, two cases, Mobley in the D.C. Circuit, Humpton in the Ninth Circuit, both of which we cited to make very clear that requesters are not entitled to a perfect search. They're entitled to a reasonable search, and that's what they actually got here well beyond a reasonable search. The first search that was done was adequate, reasonable, and sufficient. It was complete at that time. We went way beyond that. The plaintiff's theory now seems to be no good deed should go unpunished. One of the arguments that you made in the brief is that nothing that the bulldog asked for really needs to be provided because here you had a document-by-document search, right? That's one of the arguments you make, not the only one. So that goes to search terms, Judge Jordan. You're absolutely right. They've said this afternoon that we should have provided search terms for that second search that was done, which again goes above and beyond what was required. There was no need for that because if you look at the Fifth Party Declaration, Document Entry 75-2, it explains that the second search was done in the Sentinel system of a particular file that had been identified by the staffers to the review committee. So there were no search terms used at all? There was no need to do a search term because first there was a repository. That was the adequate, reasonable search. There was no need to go beyond it. That was confirmed, by the way, when we went to the Sentinel system, found that separate file that existed, and it was duplicative. But there was part of it that was not duplicative. Well, Your Honor, I don't think that's quite right. There were four documents, 11 pages, that it turned out had some alterations on them, some markings I think it was. And those were originally designated as non-responsive. They were nevertheless processed out of an abundance of caution, and again going above and beyond, and later determined, again, not to be responsive to plaintiff's FOIA request. So I think it's not really quite correct to say that there was anything new found in that context. So, again, I want to ask you about the documents. You know, I have to say, Mr. Julian kind of persuaded me that we ought to try to do this without closing the courtroom. So I'm just going to start asking about documents, and I hope I don't disclose anything I'm not supposed to, but I'm sure you'll tell me if I do. With regard to Document 2, did you give that document to the Meese Commission voluntarily, or did they direct you to produce it? Judge Martin, let me ask two things if I may. First, if I may step back and get my copies of the in-camera versions so that I can refer to them. And then secondly, I'd like to respond to your particular question, which has to do not with the redactions, as I understand it, but rather the provenance of the documents. Is that right? Correct. So I am not privy to, and the record here does not demonstrate the answer to the question that you've asked, and that's because this is a FOIA case, Your Honor. This is not a case about, for example, the plaintiffs have raised arguments about whether certain records should have been kept and should have been found, but apparently don't exist and can't be found despite the efforts made here. And they made arguments, for example, about the Federal Advisory Committee Act, the FACA. This is not a FACA case. So you don't know. I've got a lot of questions, so you don't know the answer to that. Correct, Your Honor. Okay, got it. So on the 7E, the FOIA Exemption 7E, which has to do with you can withhold information that discloses techniques and procedures for law enforcement. Yes, Your Honor. There's one of those, and I'm not going to talk about the redacted information, but my question to you is the information that's redacted is, from my point of view, so general and refers to methods that everybody walking around on the street, particularly these days, knows that the FBI engages in, that I think it passes the point of disclosing anything about law enforcement methods. Why am I wrong about that? So, Judge Martin, let me see if I can pull back a little bit and give some perspective on the techniques and procedures concerned from the FBI's perspective. I don't want to talk about this document. I mean, this is a hypothetical. So, for example, if a document said, this is not this case, said, we're going to put a GPS tracker on somebody's car. Well, everybody knows that law enforcement uses GPS trackers. And so, how would the mere mention of a GPS tracker in a document justify a FOIA exemption number 7E? So, if it were only that, Judge Martin, I don't know that it would justify it. But the context matters a great deal, and I'm going to point again to the Ninth Circuit's recent decision in the Omden. What might matter is if it disclosed what brand it was and where you placed the tracker? So, it might, Your Honor, because that might disclose to other criminals how they could evade detection. And I don't mean to suggest the circumvention requirement applies to techniques and procedures because it doesn't. But the fundamental concern is the same after all. And that's what the Hardy Declaration explains, is that knowing what kind of information. So, to take another example from the plaintiff's brief where they say, everybody knows the FBI follows the money. And that's certainly right. Everybody knows the FBI follows the money, but they don't know how the FBI follows the money. That's the technique and procedure. And knowing what kinds of money trails the FBI is particularly interested in and which ones it might pay less attention to gives away a lot about the investigation. Your argument is very interesting to me, and it caused me to be really interested in the indictment issued last Friday indicting the Russians. And it is packed full of exactly the type of information. I mean, if the worry is we're going to educate people about how to commit crimes or, you know, avoid being detected because they know we can detect them this way. I mean, it just doesn't seem like the position that you're taking. And I'm not, I'm just trying to understand because it seems like we ought to be applying consistent rules. And I mean, I'm not attributing any motive to anybody, but I just don't understand how, for example, that indictment can be so chock full of details about what programs they use to infiltrate the server. You know, and then in this case, I mean, from my standpoint, the information you give is about as general as my GPS example. I don't think it is, Judge Martin. And first of all, I think the Hardy Declaration explains why in the terms in public as much as possible and then in camera in greater detail. But let me just I don't I haven't reviewed the particular indictment you're mentioning, but I know it is typical of indictments generally that they do reveal a great deal about the investigation that led to the charges in a particular case. That's different. I'm going to turn back to Judge Jordan's example earlier about official acknowledgement, because when a prosecutor brings a criminal charge, it's incumbent to support that charge. And that's the nature of the indictment. What we're talking about here, though, is internal government documents. And there has been no judgment that it's essential to disclose this information to bring a criminal charge. And so the balance of considerations is quite different in the two circumstances. And so what has happened here is when we're talking about something like the Freedom of Information Act, where a member of the public wants to obtain access to government documents and Congress has said that certain exemptions apply, we have to figure out whether those exemptions apply as opposed to that member of the public's right to know what the government's doing. That's a very different interest from a criminal proceeding where the government's going to deprive someone of their liberty and has to prove beyond a reasonable doubt that they've committed some offense against the United States. So that's exactly what I just pointed out. It takes me back to the balance that Congress struck in the nine exemptions that counterbalance the obligation of disclosure under FOIA. So I'd like to turn to Exemption 7C and 7D in the government's cross-appeal, if I may. Just before you start on that, so what Mr. Gillen says is that if I look at this, like I have this whole, obviously, list of questions I want to ask you about because I didn't really see how your redaction actually met the requirements of the exemption. He's saying, I stopped there. I don't inquire of you any further if you haven't met the standard. Do you agree with him about that or do you disagree? What do you think about closed session? Well, I think what you should have about the particular documents in your in-camera review, just like the district judge's in-camera review, should be guided by the Vaughn Index and the declarations that explain them and support them. And again, importantly, I think it's essential to recognize that the government has to, in order to avoid burdening the court, first of all, with sort of an enormous quantity of paper, has tried to give explanations that explain categories of information. So you're willing to rouse and fall on that? Well, Your Honor, what we think the district court judge did correctly with respect to the redactions that it upheld was find adequate support in the record and confirm it in in-camera review of the records. And it's important to recognize that neither of those things was sufficient on its own. They were done together. The court looked at both aspects together. And we think that, I'm happy, by the way, if the court has questions about its in-camera review to address the next party if the court wants, but we have not requested that today and we don't think it's necessary because we do think the record is sufficient here. I'm happy to discuss any of the other specific exemptions. I'd like you to get to it. Thank you, Your Honor. So turning to Exemption 7C first, Judge Pryor, I think you raised a couple of concerns about FBI special agents, for example, that are well-recognized in the case law, for example, law in the Ninth Circuit, cases in the D.C. Circuit as well. And in the Supreme Court, the cases that that court has reached, has decided, the Reporters Committee and Favish have emphasized over and over the idea that the revelation of particular names is unlikely to shed light on what the government is up to in the meaningful, cognizable FOIA public interest. And so I want to point out that the district court here made two errors in 7C analysis. First, denigrating or diminishing the individual privacy interests. And second, suggesting that the public interests were broader than FOIA recognizes. So I think, Judge Pryor, you've already raised the individual privacy interests. I think they're well-established. I'm happy to talk about them further if you'd like. But I want to turn to the public interest. So if the district court was wrong in its evaluation of the 7C exemption, it seems to me the thing to do would be to remand for the district court to do it correctly and not for us to try to apply the 7C exemption. Do you agree with that? I don't think it's necessary to do that, Judge Pryor. You don't think it's necessary to do what? To remand. I think it is within this court's competence because we've got to go through all the documents and do it the right way and figure it out ourselves. I don't think you need to go through the documents at all, but I'll note that there are not that many, actually. The court can reverse and uphold the withholding, the redactions, on the basis of the declarations and recognizing the error in the district court's analysis, considering them. However, if the court concludes that remanding. So you don't think we need to go through the documents at all? Did you just say that? Yes, Your Honor, that's right. So I'm talking specifically about the 7C and 7D analysis, and in that respect, I want to emphasize that the district court's error was a legal error in its analysis. It didn't have anything to do with the content of the document on Exemption 7C. I'm going to turn to 7D. You made that if the district court had a misunderstanding about what the correct standard was, then we need to send it back for the district court to apply the correct standard and go, in the first instance, through the documents. Why am I not right about that? So I think the only reason it's not necessary to do that here, we're not objecting. Obviously, we think this judge was, you know, correcting his error, could do it very quickly and very easily. Of course, the judge is very familiar with the documents. All I'm saying is that because this is de novo review, other courts of appeals have recognized that they can reach the question whether information was properly withheld without need for remand. And all I'm saying is that this court can do the same, especially where the range of the number of pages here is very small. If the court does want to look at the documents, it can. Again, we're really only talking about names, addresses, social security numbers, things that are at the core of the 7C privacy interest. Can I ask you a question with regard to your cross-appeal? Yes, Your Honor. Did you, in any of the declarations, explain a reason for treating the identity of some of the agents differently than others? Yes, Judge Jordan. And what was that reason, to the extent that it was part of the publicly filed declaration? Yes, absolutely. So, for example, the plaintiffs have asked about Special Agent McGuire and why her name was disclosed when others were not. Her name is disclosed in the Review Commission's report, which we've submitted as part of our appendix, in a footnote on, I think it's page 4 or page 5 of that report. The bottom line is that's the official acknowledgment that you and I were talking about earlier with respect to what's in the public domain. The Review Commission itself officially acknowledged that. But there are other public acknowledgments. You just don't want to turn them over, and you think you're entitled to not turn them over. But public acknowledgment can't be the basis, because if it's public acknowledgment, then whether it's redacted or not redacted, there may or may not be an acknowledgment. If the Mies Commission report includes Agent McGuire's name and you voluntarily disclose that, there may be other agents' names in the Mies Commission report or other files of the Mies Commission that you've chosen not to disclose because of an exemption. But that would constitute a public acknowledgment as well, right? It is, and let me give another example. So what's the difference between Agent McGuire and other agents? I'm trying to figure that out, too. It's a different spin on the question that Judge Pryor asked earlier, Mr. Julin. Right. So the difference comes in a couple respects. So, first of all, lower-level FBI agents are generally not – they generally have their identities protected to enable them to conduct their investigative responsibilities without harassment and being associated with particular investigations. So there's a difference between lower-level and upper-level. Upper-level FBI management are routinely disclosed. So that's an FBI policy that's established. It's supported by case law as well. Where can I find that in the declaration? In which declaration do you think, if you remember? I don't recall any of them. Off my head, there were six. But you think somewhere in one of the Hardy declarations, there's an explanation of why her name is an appropriate thing to disclose, but others are not. So it doesn't identify her as compared to other individuals. It doesn't identify her by name, but it does recognize that the identities of some individuals are being disclosed because they were previously disclosed by the commission itself. And that's one example. The other example, though, is the upper-level FBI management. That's a consistent FBI policy, which I think is – Is that in the declarations too? I believe it is, Your Honor. I would need to confirm that, and I'd be happy to submit a letter after. No, we can find it ourselves. If it's anywhere, it's in one of the Hardy declarations. Either Hardy's declaration or there were two declarations by Mr. Hardy's subordinate, who in his absence submitted a couple of declarations addressing – What was his or her name? I don't remember looking at those. Again, I would need to go back and check. I believe, though, it's in the Hardy declaration. Those were toward the back end of Mr. Hardy's declarations or the front end or intermixed? So they were addressing – so they may be in the – actually, I believe where they are, Your Honor, is in the sixth Hardy declaration, which was the most recent one submitted in conjunction with the government's motion for reconsideration with respect to the 7C issue because that 7C issue – No, I apologize, Your Honor. I misspoke. I'm not sure it was in the sixth. It may have been. It's okay. We'll find it. I apologize. Thank you. So if I may, though, I think the bottom line – It may have been in the third. I don't recall, Your Honor. I would need to check, and I'd be happy to let the court know that. The bottom line, though, is that the privacy interests here are well established. Where the government has officially acknowledged, we don't withhold that information, and we have a policy of disclosing the names of upper-level management officials. I'd like to turn briefly to Exemption 7D, the confidential law enforcement source concern, which is in Document 27 and is the subject of our sealed declaration – I'm sorry, our sealed appendix, if I may. I see I'm over time, but – You may go. Very quickly. We gave your adversary a lot of time, so – Thank you. The district court concluded that it couldn't discern what information was being withheld under Exemption 7D for the confidential source at issue in this document, and we think that the in-camera submission that we provided, which we provided to this court again, identifies it block by block, and there are numbered blocks associated with each particular redaction of a few words, and they are tied to particular exemptions with explanations of why those exemptions apply, including Exemption 7D. We think that was sufficient for the court. It's also sufficient for this court, Judge Paragula, your question about remand. If the court has no further questions – I do. And again, because I have you here, and I just don't engage in this process very often, so I just want to ask you how the government handles this type of thing. So somebody was telling me that – I didn't read it myself – that there was an article in the Herald yesterday that referenced the unsealing of certain documents related to Khalid Sheikh Mohamed. Are you familiar with that? I'm not familiar with the article or the documents, Your Honor. Well, so my question is, just assume that article is there and that's what it said. Would it be the practice of the government, if there had been some recently unsealed documents, to go back through the claims that have been made in this case and make sure that they're, as of today, consistent with what's been made available by the government? So, Judge Martin, ordinarily no, and the reason for that is that FOIA litigation and FOIA requests have to come to an end at some point. They can't go on forever. We would, however, know – Well, for the classified. So for the classified, the same answer, Judge Martin, but let me explain how we think it would work in subsequent requests for the same documents. We would not rely merely on the fact that we withheld in response to a previous request. So if another request comes in asking for the same documents, there would need to be a new review at that time that would take account of any disclosures by the government or declassification by the government of particular information. So a subsequent FOIA requester may get more information than an earlier one on the basis of declassified documents in the interim. Does that answer your question, Your Honor? Thank you. If the Court has no further questions, we'd urge a reversal with respect to Exemption 177D and otherwise affirm the judgment of the District Court. Thank you. Thank you. Mr. Julin, what I'm going to do is I'll give you two minutes for rebuttal, and if there is anything to be addressed on the cross-appeal, Mr. McGinn, you've got two minutes. Thank you, Your Honor. I think that will be more than sufficient. What I want to emphasize, again, is the context in which this case arises. This is a process that Mr. Christensen started six years ago, trying to understand the simple question of why the FBI was contradicting its own article initially, and then why, when he obtained records, it seemed to reflect that the FBI was not being truthful with the public. That was a position that Senator Graham urged on us. His deep, deep concern that he's held for a long time has been that there is a Saudi network throughout the United States that's providing support to the hijackers, and that the FBI did not disclose that to Congress for whatever reason. We don't know what the reasons are. We don't know whether there's some innocent explanation. Mr. Christensen is a lone, really, reporter operating from his garage, his website, the Florida Bulldog, and he has pursued it all this time. We think that there is severe over-classification, and they've battled us on things like the search, and there's a deep concern that the battle of the search, it may be a meaningless battle in some senses, this whole idea that they didn't respond initially to his requests. They then didn't produce documents after we filed the lawsuit. They then produced the documents in an extremely confusing fashion. All of that is a huge deterrent, a huge deterrent to people from using the Freedom of Information Act in the first instance, and that is something that I think the court needs to keep in mind. What we're asking for is reversal of summary judgment with respect to the adequacy of the search, with respect to the redactions of those five documents, and with respect to the denial of the deposition of Jackie McGuire. In most Freedom of Information Act cases, everything is decided on the affidavits. Everything is decided on the declarations. You assume that they're in good faith, but there is so much here that suggests that this is not a good faith assertion, that we feel that there should be reversal on those three grounds. Okay, Mr. Julian. Mr. McGinn, do you have anything to address about the cross-appeal? May it please the Court, I'll just briefly address the application of Exemption 7D to Document 27. This is a document where the government has contended that the information must be withheld because the individual named in the document is a confidential witness. Our position is that the individual's name has already been released to the public. There was a joint interview of this witness by Florida law enforcement and also by the FBI. The Bulldog requested documents from both Florida law enforcement and the FBI. Florida law enforcement released its version of the report on the interview and identified this individual and much of the information that the FBI is now saying cannot be released. So speaking to the public domain issue that was raised earlier by Judge Jordan, clearly there's an acknowledgement that's been made here by law enforcement, not by the FBI, but by the other participant in this interview that the name of the individual was Wassam Hammoud. That's known in public domain. There's no reason for continuing to maintain his name as being worthy of redaction when it's already indisputably known to the public. It serves no interest in allowing the government to redact that information. Unless the Court has any further questions on 7C or 7D, I yield the balance of my time and urge the Court to affirm with respect to the portions of the judgment concerning Exemption 6, 7C, and 7D. Thank you, Your Honors. Thank you. We'll be in recess. Thank you. Thank you, Your Honors.